Walter G. Dennert and Mary Ellen Dennert v. Commissioner.
Dennert v. Commissioner
Docket No. 94012.
United States Tax Court
T.C. Memo 1964-5; 1964 Tax Ct. Memo LEXIS 331; 23 T.C.M. (CCH) 18; T.C.M. (RIA) 64005; January 9, 1964
*331 Miscellaneous issues relating to income and deductions, decided. D. M. Statton, for the petitioners. Ivan L. Onnen, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The Commissioner determined deficiencies in the income taxes of the petitioners for the calendar years 1958 and 1959 in the amounts of $513.64 and $861.47, respectively. The issues for decision are: 1. Where petitioners entered into a contract with a third party for the sale of real estate, under which they retained title to the property pending the buyer's payment of the purchase price in monthly installments over a period of several years (which installments were to include payments on principal together with interest), are petitioners chargeable with the interest income included in *333 the installments which they received during the taxable years, notwithstanding their purported preassignment of such interest income to the husband-petitioner as trustee for their children? 2. Are petitioners entitled to deduct as casualty losses for the taxable years involved, the amounts of $35 and $28.25 which the husband-petitioner expended during said respective years for cleaning from his personal clothing a barium solution which was spilled thereon during his practice as a radiologist? 3. For the purpose of computing depreciation for the taxable years on a Buick automobile which the husband-petitioner converted from business to personal use in 1959, what value should be attributed to said automobile as of the time of such conversion? 4. For the purpose of computing depreciation on a Mercury automobile which the husband-petitioner purchased for business use in 1959, what period of useful business life should be attributed to said automobile? 5. For the purpose of computing depreciation on an apartment building which petitioners purchased in 1959, what portion of the aggregate price paid for both the building and land should be attributed to the cost of the depreciable *334 building? 6. For the purpose of determining the amount deductible in 1959 as a charitable contribution consisting of used clothing donated to various charities, what value should be attributed to such clothing as of the time it was so contributed? The only remaining issue raised by the pleadings was settled by the parties. This involved the deductibility of bonuses paid by the husband-petitioner to certain hospital employees; and it is now agreed that petitioners are entitled to deduct in respect of the same, $100 of the $250 disallowed as a deduction for 1958, and $112.50 of the $312.50 disallowed as a deduction for 1959. Effect will be given to this adjustment in the recomputation of tax under Rule 50. Some of the facts of the case have been stipulated; and the stipulations of facts together with all exhibits identified therein are incorporated herein by reference. Hereinafter set forth are separate findings of fact and separate opinions in respect of the several above-numbered issues. Issue 1 - Interest Income from Real Estate Contract Findings of Fact The petitioners, Walter G. and Mary Ellen Dennert, are husband and wife who reside in Boone, Iowa. They filed a joint *335 income tax return for each of the years 1958 and 1959 here involved, with the district director of internal revenue at Des Moines, Iowa. The husband-petitioner during both years practiced as a physician-radiologist. On July 13, 1956, both petitioners (as sellers) entered into a real estate contract with Violet A. Jones (as buyer) for the sale of certain real estate located in Polk County, Iowa. Under the terms of this contract, the sales price was fixed at $13,950, of which the buyer paid $1,000 upon execution of the contract and agreed to pay the balance of $12,950 in monthly installments of $96 or more, plus portions of the annual taxes and also plus six percent interest on the outstanding balances until the entire purchase price had been paid. The sellers allowed the buyer to have possession of the property; but they retained title thereto pending the receipt of full payment, after which they were to deliver a warranty deed to the buyer. Also, petitioners retained various rights respecting enforcement of the contract, including the right to cancel the contract in the event of default by the buyer and then to apply any previously paid installments as rental for the buyer's use *336 of the property to the time of such default. On the back of the contract there was provided a form of "Conveyance of Interest," which could be used by either party for the purpose of assigning to others all "right, title and interest in and to the written contract and to the real estate described therein"; and which upon acceptance by the assignee would constitute an agreement by him to perform all the obligations of the assignor under said contract. One of the obligations specified in the contract was: "In the case of assignment of this contract by either party, prompt notice shall be given to the other party." Under date of September 7, 1957, which was more than a year after the above real estate contract had been executed and after the unpaid balance of the purchase price had been reduced to $12,564.52, the two petitioners, alone, executed an instrument entitled "Deed of Trust" which provided in part as follows: THIS INDENTURE made between Walter G. Dennert and Mary Ellen Dennert, hereinafter called First Parties and Walter G. Dennert, Trustee, hereinafter called the Trustee, WITNESSETH: The First Parties do hereby sell, transfer, assign and convey to the Trustee and to *337 his successors in Trust the following described property, to-wit: All of their right, title and interest in and to the interest income due by virtue of one certain contract dated July 13, 1956, wherein First Parties were the Sellers and Violet A. Jones was the Buyer of certain real estate situated in Polk County, State of Iowa, to-wit: Lot 58, Wakonda Manor, An Official Plat now included in and forming a part of Polk County, Iowa, and the said First Parties do hereby from and after this date relinquish all payments, including both principal and interest, due unto them to the said Trustee by virtue of said contract above described, subject, however, upon the express condition that the principal sum in the amount of $12,564.52 shall revert to and be the property of First Parties upon the occurrence of the event described in Paragraph (b) hereunder. * * *
b) The purpose of this Trust is to provide funds for the education of James Walter Dennert, Vicki Ann Dennert and Margaret Ellen Dennert, children of the First Parties and also any other child or children of the First Parties born hereafter and added to and included as a beneficiary hereof by endorsement by the First Parties *338 and to no others, and the Trustee shall keep the principal and income invested as hereinbefore directed until such time as the said oldest child of the First Parties attains his or her eighteenth birthday, at which time the Trust fund and all accumulations therefrom shall be divided into as many equal parts as there are then living children, who have previously been designated as beneficiaries of this Trust as aforesaid. It is expressly provided however, that in the event the equal share of James Walter Dennert should be less than the sum of $6000.00 that he shall be entitled to all of said Trust fund and accumulations therefrom up to the sum of $6000.00 and the balance if any, shall be divided equally between such designated beneficiaries. The remaining portions of the instrument defined various powers and duties of the trustee relative to the administration of the trust and the distribution of the trust property. At the time of execution of said instrument, the age of the oldest of six children of petitioners was approximately 7 1/2 years. The above indenture (Deed of Trust) was not executed by the husband-petitioner as "trustee," but only by the two petitioners individually, *339 as the "First Parties" thereto. Also, there is no evidence that the husband-petitioner, either by a separate Declaration of Trust or otherwise, at any time indicated his acceptance of the trust, or his acceptance of any obligation to act as a trustee in holding and administering trust property for the future benefit of the children as beneficiaries. The real estate contract between petitioners and Violet Jones was not expressly assigned in said Deed of Trust, nor was it mentioned therein except by way of describing the source of the future "interest income" which was purported to be assigned. Petitioners did not execute either the "Conveyance of Interest" form provided on the back of said real estate contract, or any other instrument under which they purported to assign to the trust their rights under said real estate contract; nor did the husband-petitioner execute any other instrument by which he agreed to assume and perform the obligations of "seller" under said contract. Also petitioners did not execute any deed to the husband-petitioner as trustee covering the real estate involved in said real estate contract, until January 2, 1962, which was nearly 5 years subsequent to their *340 execution of said Deed of Trust; and even then such subsequently executed deed for the real estate was neither acknowledged nor filed of record by the petitioners. Furthermore, no notice of any assignment of either the real estate contract or of the real estate mentioned therein was at any time herein material given either to Violet Jones (the purchaser of said real estate) in accordance with the terms of said real estate contract, or to the loan company to which the petitioners had mortgaged said real estate prior to their execution of said Deed of Trust. Following petitioners' execution of said Deed of Trust, Violet Jones continued to pay to them individually, as she theretofore had done, her monthly installments on said real estate contract. All these monthly payments were made by checks issued by her to the order of "Dr. Walter G. Dennert"; and the latter upon receipt of the same, endorsed the checks in his individual capacity, and then either cashed or deposited the same at the Boone State Bank & Trust Company. Most of these checks which said petitioner so received during the period from January 13, 1958, through March 19, 1959, were in the amounts of $118 each; and most of *341 those which he so received from May 29, 1959, through December 30, 1959, were in the amounts of $150 each; but in several instances, the checks were in the larger amounts of $236 or $300, and for some months no installment was paid. The totals of the installment payments thus made by Violet Jones under the real estate contract for the taxable years here involved were at least $1,197.19 for che year 1958, and at least $1,672 for the year 1959. On September 16, 1957, which was shortly after the time when the two petitioners had executed the above-mentioned Deed of Trust, the husband-petitioner opened a savings account at the Hawkeye Savings & Loan Association in Boone, Iowa, under the name of "Walter G. Dennert, Trustee." Thereafter and throughout the 2 taxable years here involved, he made monthly deposits in this account in the uniform amounts of $96 each. In general, these deposits represented portions (but not all) of the installment payments which he received from Violet Jones under the real estate contract. In several instances, the dates of such deposits preceded the dates on which he received the installment payments from Violet Jones; and the amounts of such deposits were always *342 $96 per month, even in months that Violet paid no installment or in months that the amount of her installment was larger than usual. [1] The total of the amounts so deposited in said savings account during each of the taxable years here involved was $1,152. Other unestablished portions of the installment payments which Dennert received from Violet Jones were paid over by him to the loan company to whom petitioners had mortgaged the real estate, in payment of taxes and special assessments on said real estate. *343 By July 15, 1959, the aggregate amount of said savings account at the Hawkeye Savings & Loan Association (consisting of said $96 monthly deposits plus interest paid therein by the savings association) was $2,275.71. Thereupon and on said date, petitioner Walter G. Dennert withdrew therefrom the amount of $2,275 (leaving a remaining balance of only 71 cents); and he and his wife then used all of the sum so withdrawn for their personal use in purchasing real estate in their individual names. Also on three subsequent occasions, petitioner Walter G. Dennert made further withdrawals from said "trustees savings account" for similar personal use, as follows: On January 8, 1960, after the accumulated balance in said savings account had increased again through his $96 monthly deposits to a total of $553.15, he withdrew $550 therefrom (leaving a remaining balance of only $3.15); on July 5, 1960, when the balance in the account had increased to $681.29, he withdrew $675 (leaving a remaining balance therein of only $6.29); and on July 19, 1961, when the balance in the account had increased again to $776.96, he withdrew $775 (leaving a remaining balance of only $1.96). Up to the time of the trial *344 herein, none of the sums so withdrawn from said savings account had been repaid; and also no interest on the amounts of such withdrawals had been paid. The petitioners, in their income tax returns for the taxable years here involved, did not include in their gross incomes any of the "interest income" from their real estate contract with Violet A. Jones, which they had purported to assign prior to its accrual, to the husband-petitioner as "trustee." Also at no time proximate to said taxable years was such "interest income" reported either on a fiduciary return of said "trustee," or otherwise. The Commissioner of Internal Revenue, in his notice of deficiency herein, determined that the petitioners had realized taxable interest income from said real estate contract in the amounts of $741.97 for the year 1958, and of $723.65 for the year 1959. Opinion The respondent, on brief herein, has presented two principal contentions in support of his determination that petitioners are taxable on the "interest income" which they purported to assign to the husband-petitioner as "trustee": (1) That the purported transfer was an anticipatory assignment of income, consisting of the interest *345 income which they expected would accrue and be paid in the future by Violet A. Jones, in respect of the real estate contract and the realty mentioned therein - neither of which items was assigned by them, and both of which they continued to retain and control during the taxable years involved. (2) That, in the alternative, the husband-petitioner's action in repeatedly withdrawing for his own personal use, substantially all of the monthly deposits which he from time to time made in the "trustee savings account," requires that he be "treated as the owner" of such deposits under sections 674(a), 675(a)(1), 676(a), and 677(a)(1) of the 1954 Code. However, we find it unnecessary to discuss the second of these contentions, for our following conclusions with respect to the first of these contentions are dispositive of the issue. We are convinced from our consideration and weighing of all the evidence on this first issue, and we here find as an ultimate fact and hold, that the petitioners did not, either during or prior to the taxable years involved, convey or transfer to the husband-petitioner as "trustee," all their rights and interests in and to their real estate contract with Violet *346 A. Jones or in and to the realty to which said contract pertained; and that the only item which they intended and purported to assign to such "trustee," was the future "interest income" that they expected would thereafter accrue and be paid to them by Violet A. Jones under said real estate contract. It is now a well settled principle that a taxpayer may not avoid liability for tax on his income by assigning the right to receive it. In the leading case of , it was held that where a husband had entered into a contract with his wife giving her portions of the income from his personal services, this would not result in a shift of the tax burden on such income from himself to her. In that case, Mr. Justice Holmes used the oft quoted phrase, "anticipatory arrangements * * * by which the fruits are attributed to a different tree from that on which they grew," in deciding that such anticipatory arrangements and contracts will not shift the tax burden. Also, in the subsequently decided case of , (which we regard to be here applicable and here controlling), it was held that the holder of interest-bearing *347 bonds could not shift the burden of tax on the interest therefrom, by detaching and giving the bond coupons to his son prior to their due date. To the same effect, see also , affirming a Memorandum Opinion of this Court. We decide this issue in favor of the respondent. Issue 2 - Alleged Casualty Loss Findings of Fact Petitioner Walter G. Dennert is, as before stated, a physician-radiologist. During the course of such practice, a barium solution that he used in treating patients would from time to time be spilled or splashed on his personal clothing, notwithstanding his attempt to protect such clothing by wearing an apron; and in the taxable years involved, he expended the respective amounts of $35 and $28.25 for cleaning such personal clothing in order to remove barium deposits therefrom. There is no evidence that the clothing was permanently damaged; or that there was a difference in its value before the barium solution was spilled thereon and after such solution was removed by the cleaning process. Said petitioner, on his income tax returns, deducted said cleaning expenditures as casualty losses; but the respondent, *348 in his notice of deficiency, disallowed these deductions. Opinion Section 165(c)(3) of the 1954 Code provides that an individual may deduct: "[Losses] of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft." In construing the term "other casualty," this Court has held that the rule of ejusdem generis is applicable, and that for a loss to be deductible under said statute, it must be similar in character to those losses which are more specifically described therein. ; . Also, as we pointed out in the latter case, the term "casualty" excludes the deterioration of property through a usual or steadily operating cause. It is our opinion that the mere soiling of personal clothing, which may be remedied by cleaning or laundering, is not sufficient, in the absence of any evidence that the value of the clothing was less after the cleaning than it was prior to being soiled, to qualify the cleaning expense as a "casualty loss" within the meaning of said statute. Petitioner has not claimed or attempted to qualify said expense *349 of cleaning his personal clothing as a "trade or business expense" under section 162(a) of the statute; and accordingly we do not reach or pass upon such a question. We decide this second issue in favor of the respondent. Issue 3 - Depreciation on Buick Automobile Findings of Fact In March 1956, the husband-petitioner purchased a Buick automobile; and thereafter until February 1959, he used the same in his professional practice. On the latter date he converted the car solely to personal use. At the end of the year 1958, the mileage that the car had been driven was approximately 58,000 miles. The respondent, in his notice of deficiency, determined that the fair market wholesale value of said automobile at the time of its conversion to personal use in February 1959, was $1,500; and that the amounts of depreciation which petitioners had claimed thereon for the taxable years involved (being $683.50 for 1958, and $41.01 for 1959), should be adjusted as follows: Cost of 1956 Buick with accessories
$4,722.50 meaning of said statute. Petitioner has not claimed or attempted to qualify said expense of cleaning his personal clothing as a "trade or business expense" under section 162(a) of the statute; and accordingly we do not reach or pass upon such a question. We decide this second issue in favor of the respondent. Issue 3 - Depreciation on Buick Automobile Findings of Fact In March 1956, the husband-petitioner purchased a Buick automobile; and thereafter until February 1959, he used the same in his professional practice. On the latter date he converted the car solely to personal use. At the end of the year 1958, the mileage that the car had been driven was approximately 58,000 miles. The respondent, in his notice of deficiency, determined that the fair market wholesale value of said automobile at the time of its conversion to personal use in February 1959, was $1,500; and that the amounts of depreciation which petitioners had claimed thereon for the taxable years involved (being $683.50 for 1958, and $41.01 for 1959), should be adjusted as follows: *350 Cost of 1956 Buick with accessories
$4,722.50
Depreciation claimed 1956 & 1957
$2,713.76
Depreciation claimed 1956 & 1958
833.50
Depreciation claimed 1956 & 1959
48.51
3,595.77
Adjusted basis February 1959
$1,126.73
Fair market value February 1959
1,500.00
Over depreciated
$ 373.27
Depreciation claimed and disallowed for 1959
48.51
Depreciation decreased for 1958
$ 324.76
Opinion Said petitioner contends that the respondent erred in determining the value of the automobile to be $1,500 at the time of its conversion to personal use in 1959; and that such value was not more than $1,100. In support of such lower value he testified that his examination of the N.A.D.A. valuation book at a garage, disclosed that the average cash value of an average driven car of the make and age of his, was $1,100; but the usual mileage for such average driven car was from 10 to 15 thousand miles per year, whereas he had driven his car nearly 25,000 miles per year. On the basis of all the evidence herein, we decide this issue in favor of the petitioner. We direct that in the recomputation of tax herein, the value of petitioner's Buick automobile at the *351 time of its conversion to personal use be allowed in the amount of $1,100; and that the amounts of depreciation allowable thereon for the years 1958 and 1959 be adjusted accordingly. Issue 4 - Depreciation on Mercury Automobile Findings of Fact In February 1959, the husband-petitioner purchased a new Mercury automobile; and thereafter during said year, he used the same in the practice of his profession. The respondent, in his notice of deficiency, determined the allowable depreciation on this car by employing the double declining balance method of depreciation as claimed by the petitioner; but he also used a 5-year estimated future life for the car, rather than a 4-year useful life as claimed by said petitioner. Opinion The evidence herein establishes that the average annual mileage that the petitioner drove his automobile in the practice of his profession was about 25,000 miles; and that at the end of 4 years, said Mercury automobile would probably be driven approximately 100,000 miles, and would then have little or no remaining useful business life. time of its conversion to personal use be allowed in the amount of $1,100; and that the amounts of depreciation allowable *352 thereon for the years 1958 and 1959 be adjusted accordingly. Issue 4 - Depreciation on Mercury Automobile Findings of Fact In February 1959, the husband-petitioner purchased a new Mercury automobile; and thereafter during said year, he used the same in the practice of his profession. The respondent, in his notice of deficiency, determined the allowable depreciation on this car by employing the double declining balance method of depreciation as claimed by the petitioner; but he also used a 5-year estimated future life for the car, rather than a 4-year useful life as claimed by said petitioner. Opinion The evidence herein establishes that the average annual mileage that the petitioner drove his automobile in the practice of his profession was about 25,000 miles; and that at the end of 4 years, said Mercury automobile would probably be driven approximately 100,000 miles, and would then have little or no remaining useful business life. We decide this issue in favor of the petitioners; and we direct that in the recomputation of tax herein, the depreciation on said Mercury automobile be computed in accordance with the double declining balance method of depreciation, and on the *353 basis of a useful life of 4 years. Issue 5 - Depreciation on Apartment Building Findings of Fact In July 1959, the petitioners entered into a contract, pursuant to which they purchased an apartment house property, including both the land and the apartment house together with a small garage, for $33,000. The measurements of the land were 180 feet by 60 feet. The sellers reserved an option to repurchase the rear 48 feet of said 180-foot depth on which the small garage was located for $1,000. The garage was about 30 years old. For the purpose of claiming depreciation on the apartment house, petitioners allocated thereto $32,000 of said total purchase price; and they allocated only $1,000 to all the land. The Commissioner determined however, that $2,500 of the total cost of the property should be allocated to the land; and that $30,500 of said total cost should be allocated to the depreciable apartment house. Such adjustment reflected the proportionate values at which the land and the building had been assessed for local tax purposes; and the result of such adjustment was to reduce the allowance for depreciation for the year 1959 to $406.67 as compared with $426.67 which the *354 petitioners had claimed in their income tax return (being a reduction of $20). Opinion The petitioners' evidence herein is insufficient to establish the fair market value of either the apartment house or the land, as of the date that the same were acquired; nor is such evidence sufficient to establish that the portion of their total cost which is properly allocable to the apartment house, is less than the amount of $30,500 which the Commissioner determined. We decide this fifth issue in favor of the respondent. Issue 6 - Charitable Contributions Findings of Fact During the year 1959, the petitioners donated various used clothing to a school for a rummage sale, and they also donated various other used clothing to a church. Included in these donations were articles of clothing which their oldest son and their oldest daughter had worn and outgrown, and also articles of adults' worn winter clothing. None of such articles was otherwise specifically identified; and some of the articles had been in storage for a period of 2 years. No appraisal of any of the separate articles was made at the time of their donation. The petitioners estimated that the original cost of all said *355 clothing was approximately $525; and in their 1959 income tax return they claimed a deduction of $200 for "clothes donated to charity drives" (being approximately 40 percent of said estimated cost of the clothing when new). The Commissioner, in his notice of deficiency, determined that the value of the clothing donated did not exceed $100, at the time when it was donated; and he adjusted the amount of the claimed charitable deduction accordingly. Opinion The evidence herein is insufficient to estab lish that the value of the worn and outgrown clothing donated to charities was greater than the $100 which the Commissioner determined and allowed. donations were articles of clothing which their oldest son and their oldest daughter had worn and outgrown, and also articles of adults' worn winter clothing. None of such articles was otherwise specifically identified; and some of the articles had been in storage for a period of 2 years. No appraisal of any of the separate articles was made at the time of their donation. The petitioners estimated that the original cost of all said clothing was approximately $525; and in their 1959 income tax return they claimed a deduction of $200 for *356 "clothes donated to charity drives" (being approximately 40 percent of said estimated cost of the clothing when new). The Commissioner, in his notice of deficiency, determined that the value of the clothing donated did not exceed $100, at the time when it was donated; and he adjusted the amount of the claimed charitable deduction accordingly. Opinion The evidence herein is insufficient to estab lish that the value of the worn and outgrown clothing donated to charities was greater than the $100 which the Commissioner determined and allowed. We decide this issue in favor of the respondent. Decision will be entered under Rule 50. Footnotes
1. The evidence does not establish what portions of the $96 deposits made in said account at the Hawkeye Savings & Loan Association represented "interest income" from the real estate contract with Violet A. Jones; but at least part of the same represents payments of principal (i.e., on the $12,564.52 unpaid sales price of the real estate) which under the terms of the Trust Deed was to "revert" to the petitioners. It is obvious that, as the installments received from Violet Jones gradually reduced the unpaid balances of said sales price for the real estate, the amounts of "interest" payable on such balances decreased; and that at the same times, the portions of the installment payments which were allocable to principal (as distinguished from interest) continually increased.↩